## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM B. JAMESON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0111-WS-B** |
| | ) | |
| **PINE HILL DEVELOPMENT, LLC,** | ) | |
| ***et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the Court on plaintiff's Motion for Immediate Relief (doc. 6) filed on the morning of February 21, 2007. Later that same day, defendants filed a pleading styled Motion to Compel Arbitration / Opposition to Motion for Immediate Relief (doc. 10). On the afternoon of February 22, 2007, the undersigned conducted a telephone conference on the Motion for Immediate Relief, affording counsel for all parties an opportunity to be heard.

### I.    Background.

According to the Verified Complaint, plaintiff, William B. Jameson, entered into a Purchase and Escrow Agreement with defendants Pine Hill Development, LLC, and Seaside Title Company, LLC, in June 2005 to buy a condominium unit at a new development known as The Enclave at Oak Hill, Phase One, in Gulf Shores, Alabama. (Complaint, ¶¶ 1, 6.) Defendant Pine Hill is the developer of that project. The agreed purchase price was $299,000, which included an earnest money deposit of $29,900 and an irrevocable letter of credit for an additional $29,900. (*Id.*, ¶¶ 6-7; Agreement, ¶ 2.) Both the earnest money deposit and the letter of credit were to be held by defendant Seaside, as escrow agent. (Agreement, ¶¶ 2, 4.) Promptly after signing the Agreement, Jameson furnished the requisite earnest money deposit and letter of credit ("LOC") to Seaside. (Complaint, ¶ 7.)

The Agreement confirms that there were no existing completed improvements on the property, and repeatedly states that Pine Hill reserved the right, in its sole and absolute

discretion, not to develop the condominium project.  (Agreement, at 1, 7, 8.)  That said, the Agreement specifies that if Jameson's unit is not completed within two years after the Agreement's effective date, then the Agreement shall be null and void, at which time all monies paid by Jameson would be refunded, along with accrued interest and the LOC.  (*Id.*, ¶ 6(B).)

The Agreement contains specific provisions relating to the issues of closing and default. Jameson agreed that he "will be required to close upon the issuance of the certificate of occupancy and recordation of the Condominium Documents."  (*Id.*, ¶ 11(A).)  In the event that Jameson failed to close on the designated date or otherwise defaulted, "then all monies held in the escrow account on behalf of the Purchaser (including all interest thereon) shall be paid to the Developer as liquidated and agreed upon damages."  (*Id.*, ¶¶ 11(A), 12.)[1]

A final aspect of the Agreement that is potentially relevant to the issues before the undersigned at this time is the arbitration clause found at Paragraph 20.  That paragraph states, in part, that "[a]ny dispute or claim between the parties ***which shall arise from or [is] related in any way to this contract shall be submitted to arbitration*** under the Rules of the American Arbitration Association governing commercial disputes."  (Agreement, ¶ 20 (emphasis added).)

From the Verified Complaint and accompanying documents, it appears that Jameson's unit is substantially complete, triggering the closing provisions of the Agreement.  In that respect, plaintiff's filings show that Pine Hill demanded closing on January 9, 2007, but that Jameson refused to move forward because it is his position that the Agreement is rescindable pursuant to the Interstate Land Sale Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* ("ILSFDA"

---

[1]     Both parties' submissions assume that a default by Jameson would entitle Pine Hill to call, cash or otherwise collect on the LOC.  But the contractual basis for that assumption is not immediately evident.  After all, the default provision of the Agreement speaks only to forfeiture of "all monies held in the escrow account" should Jameson default.  (Agreement, ¶ 12.)  It would not appear that a LOC constitutes "monies held in the escrow account."  Likewise, the Agreement's escrow agent provisions discuss the LOC in detail, and state that Seaside may draw on the LOC if Jameson should fail to replace the LOC no later than 30 days prior to its expiration.  (*Id.*, ¶ 4.)  The Court's review of the Agreement fails to disclose any provision that expressly confers upon Pine Hill and Seaside the right to draw on the LOC in the event that Jameson refuses to close.  Nonetheless, the question of defendants' contractual rights vis a vis the LOC in the event of default is not directly implicated by the pending Motion for Immediate Relief, and that question is best reserved for another day.

or the "Act").  (Complaint, ¶ 13.)  Notwithstanding Jameson's position, defendants notified plaintiff that if a closing date had not been scheduled by February 15, 2007, Jameson would be deemed in default.  (*Id.*, ¶ 14.)  Rather than waiting for Pine Hill to declare him in default, Jameson initiated this action against Pine Hill and Seaside, requesting a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that, *inter alia*, Pine Hill is in violation of the ILSFDA, that Jameson can properly rescind the Agreement, and that Jameson is entitled to a refund of his earnest money deposit and cancellation of the LOC.

In an effort to stymie any default proceedings that defendants might undertake with respect to the earnest money and LOC, Jameson filed a Motion for Immediate Relief requesting entry of a temporary restraining order, with notice to defendants.  The TRO sought by plaintiff would forbid Seaside from declaring Jameson in default, from drawing on the LOC, and from releasing the earnest money from escrow.  Defendants oppose the Motion on the grounds that any provisional relief must be decided by an arbitrator rather than by this Court, and that the prerequisites for entry of a TRO have not been satisfied here in any event.  These arguments will be addressed in turn.

## II.     Analysis.

### A.     *Impact of the Arbitration Clause on the Request for TRO.*

As a threshold matter, defendants assert that the Motion for Immediate Relief should be denied because the Agreement is subject to a binding arbitration clause.  Based on that clause, defendants suggest, this Court cannot reach the question of whether emergency injunctive relief is appropriate because that question is reserved for the arbitrator to decide.  Defendants cite no authority in support of this proposition.

The Court's own research reflects that the overwhelming majority of federal courts to rule on the question have concluded that a binding arbitration clause does not bar a plaintiff from seeking emergency injunctive relief or other provisional remedies in court.  *See, e.g.,* *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1380 (6th Cir. 1995) (concluding that district court erred as a matter of law when it concluded that it could not enter preliminary injunctive relief because the parties' dispute was the subject of mandatory arbitration); *Merrill Lynch, Pierce, Fenner & Smith v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993) ("the weight of federal appellate authority recognizes some equitable power on the part of the

district court to issue preliminary injunctive relief in disputes that are ultimately to be resolved by an arbitration panel"); *Ortho Pharmaceutical Corp. v. Amgen, Inc.*, 882 F.2d 806, 812 (3rd Cir. 1989) ("we hold that a district court has the authority to grant injunctive relief in an arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied").[2] There appear to be no Eleventh Circuit decisions on point.

Upon careful review of the authorities referenced herein, the Court finds that the majority view is persuasive, both on legal and policy grounds. *See Danieli*, 190 F. Supp.2d at 155 ("The principle underlying the authority of a district court to preserve the status quo pending arbitration is the moving party's right to retain its remedies during such proceedings."); *Performance Unlimited*, 52 F.3d at 1379-80 (explaining that forbidding district courts to issue preliminary injunctive relief to preserve status quo pending arbitration may undermine the meaningfulness of the arbitration process, reducing it to a hollow formality because award could not return parties to status quo ante). Accordingly, the existence of an arbitration provision that may govern this dispute in no way impairs the Court's authority to grant preliminary injunctive relief to preserve the status quo pending arbitration if the Rule 65 prerequisites are satisfied.

---

[2]        *See also Danieli v. C. Officine Meccaniche S.p.A. v. Morgan Construction Co.*, 190 F. Supp.2d 148, 154 (D. Mass. 2002) ("Notwithstanding the arbitrability of the parties' dispute, this Court has the authority to grant preliminary injunctive relief to preserve the status quo pending arbitration even though either [party] may later request arbitration."); *Norcom Electronics Corp. v. CIM USA Inc.*, 104 F. Supp.2d 198 (S.D.N.Y. 2000) ("the fact that a dispute is to be arbitrated ... does not absolve the court of its obligation to consider the merits of a requested preliminary injunction"); *American Express Financial Advisors, Inc. v. Scott*, 955 F. Supp. 688, 694 (N.D. Tex. 1996) ("This Court has the right to issue preliminary injunctive relief pending arbitration even though either [party] may later request arbitration."); *Wine Not, Int'l v. 2atec, LLC*, 2006 WL 1766508, *12 (M.D. Fla. June 26, 2006) (similar). Notwithstanding the foregoing, the extant precedents are not unanimous, as a minority view prohibits the granting of emergency injunctive relief in an action subject to pending arbitration. *See Manion v. Nagin*, 255 F.3d 535, 538-39 (8th Cir. 2001) (in cases implicating Federal Arbitration Act, "courts should not grant injunctive relief unless there is qualifying contractual language which permits it"); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) (affirming lower court's denial of preliminary injunction because all of plaintiff's claims were arbitrable and arbitral panel was authorized to grant provisional remedies, such that preliminary injunction by district court would have been inappropriate).

**B.    *Rule 65 Prerequisites for Issuance of a TRO.***

To be eligible for temporary restraining or preliminary injunctive relief under Rule 65, Fed.R.Civ.P., a movant must establish each of the following elements: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). Defendants challenge both the "substantial likelihood of success on the merits" and the "irreparable injury" prongs of the Rule 65 analysis.

*1.    Substantial Likelihood of Success on the Merits.*

To show a substantial likelihood of success on the merits, Jameson relies on provisions of the ILSFDA that render land transactions rescindable in certain circumstances. Specifically, it is unlawful under the Act for any developer to sell any nonexempt lot unless a statement of record has been filed with the Department of Housing and Urban Development and unless a printed property report has been furnished to the purchaser prior to the signing of any purchase agreement. 15 U.S.C. § 1703(a)(1)(A),(B). The Verified Complaint alleges, and defendants do not contest, that no statement of record was filed and no property report was furnished to Jameson in advance of the Agreement's execution. (Complaint, ¶ 9.) On that basis, Jameson asserts that the Agreement is rescindable pursuant to § 1703(c) of the Act, which provides that if a required property report is not furnished to the purchaser in advance of signing the agreement, "such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing." 15 U.S.C. § 1703(c). Because the Act required Pine Hill to provide a property report to Jameson in advance of execution of the Agreement, because it is undisputed that Pine Hill failed to do so, and because the ILSFDA confers upon Jameson the right to revoke the transaction in those circumstances, Jameson maintains, he has shown a substantial likelihood of success on the merits of this litigation, in which he seeks a declaration rescinding the Agreement and awarding him the return of his earnest money deposit.

Defendants' sole argument to the contrary is that this transaction is exempt from the ILSFDA, and is therefore not rescindable. In particular, defendants invoke an exemption which

applies to "the sale or lease of land under a contract obligating the seller or lessor to erect [a condominium] thereon within a period of two years." 15 U.S.C. § 1702(a)(2). According to defendants, the § 1702(a)(2) exemption is operative here, as Paragraph 6(B) of the Agreement renders the contract null and void if the project is not completed within two years. But the Agreement plainly provides that Pine Hill has repeatedly, emphatically disclaimed any responsibility to build the condominium project at all. Simply put, the Agreement is structured in such a manner that Pine Hill did not obligate itself to build anything ever. The Agreement therefore cannot logically be viewed as satisfying the § 1702(a)(2) requirement that Pine Hill be obligated to erect a condominium within two years. *See Markowitz v. Northeast Land Co.*, 906 F.2d 100, 106 (3rd Cir. 1990) (where contract simply provides that developer must return purchaser's deposit if the project was not built within two years, developer is under no obligation to erect condominium and contract is not exempt from Act under § 1702(a)(2)); *Fortunato v. Windjammer Homebuilders, Inc.*, 2006 WL 208777, *3 (M.D. Fla. Jan. 25, 2006) (construing ILSFDA exemptions narrowly, and finding that § 1702(a)(2) exemption was inapplicable where contract lacked unwavering obligation to construct within two years); *N & C Properties v. Windham*, 582 So.2d 1044, 1047 (Ala. 1991) ("Because there is no unconditional commitment to complete the units within the two-year period, the units do not fall within the exemption provided under § 1702(a)(2).").

On the argument and authorities before the Court at this time, it appears unlikely that the § 1702(a)(2) exemption can shield Pine Hill from ILSFDA obligations in this case. Of course, final disposition of this merits question is not proper at this juncture; rather, it suffices to say that the § 1702(a)(2) exemption is not fatal to plaintiff's ability to establish a substantial likelihood of success on the merits for purposes of eligibility for emergency injunctive relief. As defendants have proffered no other legal or factual basis for overcoming plaintiff's showing that he is substantially likely to be entitled to rescind the Agreement under the ILSFDA, the "substantial likelihood of success" requirement for entry of a TRO is satisfied.[3]

---

[3]    During the telephone conference, plaintiff's counsel also suggested that Seaside may be in violation of its fiduciary duties under Alabama law because it is acting in the interest of the developer without fulfilling its fiduciary duties to Jameson. This argument may or may not be valid, and may or may not support a claim against Seaside in this litigation, but it does not

2.    *Irreparable Harm.*

Defendants also maintain that plaintiff cannot show that he is likely to suffer immediate irreparable damage as a result of the denial of a TRO, inasmuch as a monetary ward will be a sufficient and adequate remedy to protect Jameson's interests if he should prevail on the merits. (Opposition Brief, at ¶ 5.)

The Eleventh Circuit has emphasized that "[a] showing of irreparable injury is the sine qua non of injunctive relief" and that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  To pass muster and meet plaintiff's burden of proof, "the asserted irreparable injury must be neither remote nor speculative, but actual and imminent."  *Id.* (citations omitted); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (explaining that a party is entitled to injunctive relief only if he can show "a real and immediate - as opposed to a merely conjectural or hypothetical - threat of *future* injury").  In addition to being real and immediate, the threat of harm must be irreparable; indeed, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *United States v. Jefferson County*, 720 F.2d 1511, 1520 (11th Cir. 1983).

Jameson identifies three forms of ostensibly immediate and irreparable injury if defendants should hold him in default, distribute the earnest money proceeds, and draw on his LOC at this time.  First, Jameson asserts harm to his "credit standing," suggesting that a black mark might appear on his credit report and his ability to procure credit in the future may be irreparably and irretrievably damaged once the LOC is called.  In response to questioning from the Court, however, plaintiff's counsel conceded that there is no evidence that an attempt by defendants to call the LOC will diminish plaintiff's standard of living or materially impair his

_____

enhance plaintiff's quest for immediate injunctive relief.  As stated *supra*, plaintiff has shown a substantial likelihood of success on the merits as to his existing declaratory judgment cause of action against defendants.  Whether he might also have a viable claim against Seaside for breach of fiduciary duty is of no consequence to this aspect of the Rule 65 analysis, because plaintiff has already shown the requisite substantial likelihood of success on the merits as to his other cause of action.

ability to obtain credit in the future.  Such speculative, conjectural harm does not constitute the sort of irreparable injury required to be eligible for emergency injunctive relief.

Alternatively, Jameson asserts that the harm to him would be irreparable because "he would face a substantial likelihood that he would be unable to collect upon a judgment in his favor." (Motion, ¶ 4.)  In that regard, Jameson suggests that Seaside's ability to pay any monetary judgment in this case may be compromised by its status as a defendant in 14 other Alabama lawsuits.  But the mere presence of Seaside as a defendant in other cases, without more, is not indicative of any substantial, definite risk that Seaside would be unable to pay any money judgment here.  Likewise, plaintiff's statement during the telephone conference that Pine Hill is a defendant in four pending actions in Baldwin County, Alabama sheds no light on its ability to pay a money judgment in this case.  There is no evidence that Pine Hill and Seaside are financially troubled, much less that they are insolvent, judgment-proof or on the brink of being rendered so by other litigation.  Besides, the paramount concern identified by plaintiff in this case is the disposition of his $29,900 earnest money deposit and the $29,900 LOC.  By all appearances, this case is principally a dispute over roughly $60,000.  Any suggestion that defendants are or may become unable to satisfy a monetary judgment ordering them to repay that $60,000 to plaintiff is so speculative that it cannot rise to the level of irreparable harm for purposes of the Rule 65 inquiry.[4]

In a final attempt to demonstrate irreparable harm, plaintiff points to the arbitration provision, which he construes as foreclosing certain categories of remedies to him.  If this Court

---

[4]    During the telephone conference, plaintiff requested that he be given an opportunity to take limited depositions of Seaside and Pine Hill for the purpose of determining their financial status and ability to pay a monetary judgment.  However, this kind of needle-in-the-haystack discovery search could quickly become lengthy and complex as plaintiff investigates defendants' finances.  Such a meandering, potentially time-consuming expedition is logistically problematic and substantively inconsistent with the emergency, immediate nature of the provisional remedy sought by Jameson in his Motion.  Besides, this discovery request is founded on nothing more than conjecture that these defendants might be in poor financial health.  The Court will not authorize preliminary discovery on that matter, which would entail freezing the status quo for weeks or months until such time as a definitive reading on defendants' finances could be procured through the discovery process, all without a showing of irreparable harm in the interim.  This would amount to a de facto preliminary injunction in plaintiff's favor without requiring him first to satisfy the Rule 65 prerequisites.

refers this action to arbitration at some future time, Jameson argues, the harm will become irreparable because his remedies are so circumscribed by the arbitration provision that he can never be made whole in an arbitral forum. This argument may (or may not) form a viable basis for combating defendant's Motion to Compel Arbitration, but it is unavailing in a Rule 65 inquiry. In effect, this argument stacks speculation atop speculation, as Jameson is arguing that if his credit standing is injured (a speculative proposition in itself), he will sustain irreparable harm if the arbitration clause is enforced (which is also speculative at this stage of the proceedings). Furthermore, if the arbitration clause is enforced, then the result would be that Jameson could pursue those remedies which he contracted to pursue, and nothing more. Any valid waiver by Jameson of any categories of remedies in the Agreement cannot support a finding of irreparable harm, or harm at all, for the simple reason that Jameson agreed to circumscribe his remedies in that manner. That said, as previously mentioned, the question of enforceability of the arbitration provision is not ripe at this time. Any ruling on that question would be premature given that the issue has not yet been briefed and the parties have not yet had a fair opportunity to be heard on the Motion to Compel Arbitration.

In light of the foregoing, the undersigned concludes that plaintiff has not satisfied his burden of showing a substantial likelihood of irreparable injury in the absence of entry of a temporary restraining order. If defendants hold Jameson in default, disburse the earnest money deposit, and draw on the LOC, Jameson may incur financial harm to the tune of almost $60,000. There has been no showing, however, that a money judgment would be inadequate to remediate that harm. Nor has there been any showing that Jameson is reasonably likely to sustain any injuries to his credit standing or other non-monetary injuries that might not be redressible via a monetary recovery. Because plaintiff has not shown a likelihood of irreparable injury, he is ineligible for a temporary restraining order.

**III.    Conclusion.**

For the foregoing reasons, plaintiff's Motion for Immediate Relief (doc. 6) is **denied**. With respect to defendant's Motion to Compel Arbitration (doc. 10), any party opposing the Motion must file a response, supported by legal authority as appropriate, on or before **March 5, 2007**. Defendants will be allowed until **March 12, 2007** to file a reply. If the Court determines

-9-

that oral argument is necessary, the parties will be notified and a hearing will be scheduled. Otherwise, the Motion to Compel Arbitration will be taken under submission after March 12, 2007.

DONE and ORDERED this 23rd day of February, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE